## UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
#### ORLANDO DIVISION

**BOBBY WOOD,**

                             **Plaintiff,**

**-vs-**                                                    **Case No.  6:06-cv-590-Orl-KRS**

**COMMISSIONER OF SOCIAL
SECURITY,**

                             **Defendant.**

_____

## ORDER

        This cause came on for consideration without oral argument on the Complaint filed by

Bobby Wood seeking review of the final decision of the Commissioner of Social Security denying

his claim for social security benefits.  Doc. No. 1.[1]  The Commissioner answered the Complaint

and filed a certified copy of the record before the Social Security Administration (SSA).  Doc.

Nos. 9, 10.  Pursuant to the consent of the parties, this matter has been referred to me for

disposition under 28 U.S.C. § 636(c).  Doc. No. 18.

**I.       PROCEDURAL HISTORY.**

        In 2004, Wood applied for disability benefits under the Federal Old Age, Survivors and

Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq., and under the Supplemental

Security Income for the Aged, Blind and Disabled Program (SSI), 42 U.S.C. § 1381, *et seq*.

_____

        [1] Wood previously applied for disability benefits.  That application was denied in 1998.  *See*
R. 29-37.

(sometimes referred to herein as the Act).[2]  R. 83-85. The applications alleged that Wood became

disabled on May 15, 1995.  R. 83.  Wood's applications were denied initially and on

reconsideration.  R. 54-60, 66-67.

Wood requested a hearing before an administrative law judge (ALJ).  R. 51.  An ALJ held

a hearing on October 19, 2005.  Wood, represented by an attorney, testified at the hearing.  R. 329-

55.  A vocational expert (VE) also testified at the hearing.  355-60.

After considering the testimony and the medical evidence presented, the ALJ determined

that Wood was insured through December 31, 2000.  R. 11.  The ALJ found that Wood had not

engaged in substantial gainful activity since May 15, 1995, the alleged onset date of his disability.

R. 12.

The ALJ concluded that the medical evidence showed that Wood had depression,

rheumatoid arthritis, and cervical and lumbar degenerative disc disease, which were severe

impairments.  R. 13.  These impairments did not meet or equal any of the impairments listed in the

applicable social security regulations (the Listings).[3]  R. 14.

After considering all of the evidence in the record, the ALJ found that Wood had the

residual functional capacity (RFC) to perform a significant range of light work[4] with occasional

---

[2]  The SSI application is not in the record.  However, the parties agree that an SSI application was also filed.

[3]  The Code of Federal Regulations "contains a Listing of Impairments . . . specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories."  *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004); 20 C.F.R. Part 404, Subpt. P, App. 1.

[4]  Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job

postural limitations.  The ALJ concluded that Wood was "occasionally able to climb stairs, ramps, ladders, ropes or scaffolds and occasionally balance, stoop and crouch."  R. 15.

The ALJ concluded that Wood's mental impairment would result in mild restriction of activities of daily living and social functioning, and moderate difficulties maintaining concentration, which limited his ability to perform simple tasks, with no episodes of decompensation of extended duration.  As such, the ALJ concluded that Wood would be "limited to simple, unskilled work that is essentially isolated with only occasional supervision and that is low stress defined as only occasionally requiring judgment or decision making."  R. 15.

In reaching this decision, the ALJ did not give controlling weight to the opinion of Dr. Kohen, one of Wood's treating physicians.  The ALJ found that Dr. Kohen's assessment on a "fill-in-the-blank form" was not substantiated with an explanation as to how the doctor reached his conclusions and was inconsistent with the other medical records before the ALJ.  R. 17.  Instead, the ALJ gave significant weight to the opinions of the reviewing physicians, Dr. Attlesey and Dr. Hankins.  R. 17-18.

The ALJ also found that while Wood's medically determinable impairments could reasonably be expected to cause Wood's symptoms, his statements concerning the intensity, duration, and limiting effects of the symptoms were not fully credible.  The ALJ based this conclusion on a finding that Wood's testimony was inconsistent with the medical records, his activities of daily living, and the ALJ's observations of Wood during the hearing.  R. 16.

---

is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b).

Based on the VE's testimony, the ALJ concluded that Wood could not perform his past relevant work as a construction worker and commercial fisherman.  R. 18.  Relying on the testimony of the VE and considering the Medical-Vocational Guidelines (the Grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2, as a framework, the ALJ concluded that Wood could work at the unskilled sedentary jobs of surveillance systems monitor and call-out operator, and the unskilled light jobs of counter clerk and telephone investigator, all of which existed in significant numbers in the national economy.  R. 19-20.  The ALJ determined that the VE's testimony was consistent with the information in the *Dictionary of Occupational Titles* (DOT).  Accordingly, the ALJ concluded that Wood was not disabled.  R. 20.

Wood requested review of the ALJ's decision.  R. 6.  On February 24, 2005, the Appeals Council issued a decision finding no basis to review the ALJ's decision.  R. 3-5.  Wood timely sought review of the decision by this Court.  Doc. No. 1.

## II.     JURISDICTION.

The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Wood's request for review.  *See Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998); 20 C.F.R. §§ 404.981, 416.1481.  Therefore, the Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

## III.    STATEMENT OF FACTS.

A.      *Wood's Testimony.*

Wood was born on October 2, 1960.  He has obtained a GED.  He is 5'8" tall and weighed approximately 195 pounds at the time of the hearing.  R. 332.

-4-

Wood previously worked as a construction insulation mechanic. In that job, he used ladders and scaffolds, performed heavy lifting, and was required to stand and walk all day.  Prior to working as an insulation mechanic, Wood worked as a commercial fisherman, which required heavy lifting. R. 333.  Wood quit working in May 1995 because of pain in his feet. R. 334.  He looked for work while he drew unemployment compensation, but he never returned to work. R. 335.

Wood testified that he had pain in his hips, feet, hands, neck, and the middle of his back. The pain was caused by rheumatoid arthritis, with which he was diagnosed in 1995 or 1996.  R. 335.  He also had herniated discs, degenerative disease, ankylosis,[5] and spondylitis,[6] for which he has never had surgery.  He was taking medication prescribed by his treating physician, Dr. Kohen, but he stopped after being unable to afford the cost of the blood test required for the medication. He then began taking Lortab.[7]  R. 336.

At the time of the hearing, Wood was still experiencing pain in his back every couple of days.  The pain centered in the middle of his back and radiated down his left leg, with spasms and stiffness. R. 337.  He was experiencing pain in his neck, radiating down to his left shoulder, once every two to three weeks.  When experiencing neck pain, Wood had limited mobility in his neck. R. 338.  He also had pain and numbness in his hands, and pain in his feet, hip, knees, and right

---

[5] Ankylosis is "[s]tiffening or fixation of a joint" resulting from a disease process. *Stedman's Medical Dictionary* 93 (26th ed. 1995) (*Stedman's*).

[6] Spondylitis is the "[i]nflammation of one or more of the vertebrae." *Stedman's* at 1656.

[7] Lortab is a pain reliever used to relieve moderate to severe pain. Drugs.com, *Lortab*, http://www.drugs.com/mtm/lotab.html (last visited Sept. 19, 2007).

elbow caused by arthritis, which he experienced all the time.  R. 339-40.  His arthritis prevented him from bending down and grasping objects.  R. 339.  In the morning, his hands and feet were stiff, which lasted two to three hours, or four to five hours on a cold day.  R. 352.

Pain medication sometimes reduced Wood's back pain to five or six from ten on a ten-point scale.  R. 337.  It sometimes reduced his neck pain to eight on a ten-point scale.  R. 338.  Use of Lortab made Wood tired.  R. 346.

Wood could button a shirt, count paper money, hold a coffee cup, lift a half gallon of milk, write with a pen, sometimes open jars, and open a car door or doorknob using his hands, but he sometimes had trouble picking up coins.  R. 339-40.

Wood had attempted to commit suicide three times.  R. 340.  After the last attempt in 2003, he was involuntarily hospitalized and received treatment until he lost his insurance coverage.  R. 341.  Aside from that instance, Wood had not been hospitalized for mental symptoms.  R. 341.  At the time of testifying, Wood continued to have mental symptoms, such as not wanting to leave the house, isolation, crying, thoughts of harming himself, problems with concentration, depression, and shaking.  R. 342-44, 352.  Wood had trouble sleeping, mood swings, racing thoughts, and panic and anxiety attacks about once a week to once a month lasting two to three hours.  R. 343-44.

Wood estimated that he could stand, walk, or sit for about ten to fifteen minutes without interruption.  R. 346-47.  He could climb or descend a flight of stairs, but he needed a handrail.  R. 346.  He estimated that he could lift five pounds.  He could not kneel, but he could squat or crouch

if he had a way of pulling himself up.  R. 347.  During an average night, he slept for two to three

hours before being awakened by his pain, then remained awake for a couple of hours.  R. 347-48.

Wood was able to take care of his personal hygiene, such as showering, brushing his teeth,

shaving, and dressing, but it took him awhile to complete the tasks.  R. 348.  He was able to make

light meals and drive to perform simple errands.  R. 348-49.  He drove himself to the ALJ's

hearing.  R. 332.  He lived with his mother, who did the cooking and household chores.  R. 348.

He did not visit family or friends, but his ten-year-old son visited him on weekends.  R. 349.  He

and his son would watch television or play games.  R. 350.  He attended church weekly, standing

in the back when necessary.  R. 350.  On a typical day, Wood spent the morning and afternoon

watching television or reading a book.  R. 351.  *See also* R. 109 (report of interview of Wood by

SSA representative); R. 119-26 (Wood's written activities of daily living report).

B.      *VE's Testimony*.

The VE testified that Wood's past work as a construction worker was classified as

semiskilled (SVP 4), heavy work, and his past work as a commercial fisherman was classified as

semiskilled (SVP 3) medium work.  R. 355-56.

The VE was asked to consider the following hypothetical claimant:

> [C]onsider a hypothetical individual who is about the claimant's
> stated age at onset, which is 33 years, the individual has a high
> school education, the work history that you have just talked about,
> this person has certain underlying impairments that limit to working
> at a light level of exertion, and I would like jobs at both light and
> sedentary.  This person has additional limitations being all of the
> posturals are occasional, . . . limit to simple, unskilled work.  The
> person would require work that is low stress . . . being defined as
> work that would require only occasional need for judgment or

-7-

> decision making, [and] . . . would be essentially isolated with only
> occasional supervision while on the job.

R. 356.  The VE responded that such an individual could not do Wood's past work.  R. 356.

However, the VE opined that there were a number of jobs that the hypothetical claimant could

perform that existed in significant numbers in the national economy.  R. 356-57.

 The VE stated that such an individual could perform the following jobs:  surveillance

system monitor, DOT number 379.367-010, unskilled (SVP 2) sedentary work; call-out operator,

DOT number 237.367-014, unskilled (SVP 2) sedentary work; counter clerk, DOT number

249.366-010, unskilled (SVP 2) light work; or an investigator of dealer accounts, DOT number

241.367-038, unskilled (SVP 2) light work. These jobs would accommodate a person's need to

stand up and change positions. However, these jobs would allow no more than three absences on a

monthly basis.  R. 357.

 Lastly, the VE was asked whether a claimant with the restrictions in Dr. Kohen's RFC

"could do any jobs in the economy." The VE responded that there were not jobs that such a

claimant could perform.  R. 358.

 C. *Medical Records.*

 On June 28, 1996, Wood had an MRI of his cervical spine at the Halifax Medical Center.

The exam revealed a herniated disc in the C6 - C7 area, and mild central disc protrusion  in the C5

- C6 area.  R. 192.  Records previously submitted to the SSA contained a laboratory test that was

positive for a rheumatoid factor.  R. 32.[8]

---

[8] Counsel for Wood submitted this decision at the ALJ's hearing.  R. 354.  All of the evidence
submitted in support of the original application is not in the record presently before the Court.

Wood was treated by Michael D. Kohen, M.D., beginning in 1996.  R. 142.  During an examination in January 1999, Wood complained of back and neck pain, with stiffness lasting a few hours.  He further complained that he woke up three to four times a night and was sometimes not able to go back to sleep. He was experiencing pain and swelling in his wrist and knees, and a decreasing use of his hands.  Upon examination, Dr. Kohen noted neck and left wrist tenderness. His impression was inflammatory polyarthralgias[9] and cervical disc disease.  R.  151.

Wood returned to Dr. Kohen on April 13, 1999.  R. 150.  Wood complained of low back pain radiating intermittently to his left ankle.  He also complained of morning stiffness, neck pain, and trouble sleeping due to pain.  During the examination, Dr. Kohen noted tenderness in Wood's lower back and in his left wrist, but full range of motion.  His impression continued to be inflammatory polyarthralgias and cervical and lumbar disc disease.  R. 150.

On April 23, 1999, Wood had an x-ray of his lumbar spine performed at the Bert Fish Medical Center.  Wood complained of low back pain and left sciatica.[10]  The x-ray revealed minimal degenerative spondylosis.  R. 235.  An MRI of the lumbar spine performed on the same day showed no significant disc herniation or spinal stenosis.  R. 234.

On August 6, 1999, Wood was again seen by Dr. Kohen.  Wood stated that he had persistent low back and neck pain, intermittently radiating down his left leg, and occasionally radiating to his left elbow.  He continued to experience stiffness in the morning and complained of headaches.  Upon examination, Dr. Kohen noted that the thoracic and lumbar spine area was

---

[9] Polyarthralgias is severe pain in a joint not inflammatory in character.  *Stedman's* at 149.

[10] Sciatica is "[p]ain in the lower back and hip radiating down the back of the thigh into the leg" usually caused by a herniated lumbar disc.  *Stedman's* at 1580.

tender, and range of motion in the neck and forward flexion was diminished.  Wood was limping and the strength in his legs was diminished.  Dr. Kohen's impression was  inflammatory polyarthralgias, cervical disc disease, and left sciatica.  R. 149.

Wood was next seen by Dr. Kohen on July 14, 2000.  Wood complained that his shoulders, back, hips, and knees hurt, and that he continued to experience two hours of morning stiffness.  R. 148.  Dr. Kohen noted, during examination, that Wood had decreased range of motion in his neck, decreased strength, tenderness near his thoracic spine, and he walked with a limp. Dr. Kohen's impression was rheumatoid arthritis and cervical spondylosis.  R. 148.

Wood was seen for a follow-up examination by Dr. Kohen on October 17, 2000.  Wood noted that his left arm, from his elbow to his fingers, became numb at times and was painful.   He reported increased hand pain when shrimping.  He also complained of two to three hours of morning stiffness.  Upon examination, Dr. Kohen noted that Wood's proximal interphalangeal joints were tender, but his spine and lower extremities were not tender.  Dr. Kohen further noted Wood had decreased neck motion, and that Wood's grip motion was diminished.  Dr. Kohen's impression continued to be  rheumatoid arthritis and cervical spondylosis.  R. 147.

In December 2001, Dr. Kohen prepared a disability report for an insurance company on behalf of Wood.  Dr. Kohen observed that Wood had pain, confirmed through an RA (rheumatoid arthritis) factor and neck x-rays.  R. 142.  Dr. Kohen opined that Wood had a marked (60% - 70%) physical limitation, but only a slight limitation in the ability to function under stress and engage in interpersonal relationships.  Dr. Kohen concluded that Wood was totally disabled.  R. 143.

Wood was next seen by Dr. Kohen on February 20, 2001, complaining of left wrist, left elbow, hip, knee, and shoulder pain with moderate morning stiffness.  His elbow pain caused him to have trouble picking things up, and he occasionally had pleurisy.  Dr. Kohen noted tenderness in Wood's left elbow and wrist, but none in his spine or lower extremities.  He had decreased motion in his neck, but his gait was normal.  Dr. Kohen's impression was unchanged.  R. 146.

On May 31, 2001, Wood was again seen by Dr. Kohen.  Wood was experiencing mild thoracic spine pain with some numbness, and marked morning stiffness.  Wood reported that he had hand swelling with pain, and trouble breathing and sleeping due to pain.  He reported some relief when using a Lidoderm[11] patch.  Upon examination, Dr. Kohen noted that Wood's thoracic spine was tender, he had decreased grip strength, and decreased motion in his neck.  Dr. Kohen's impression was unchanged.  R. 145.

Wood was next seen by Dr. Kohen on November 30, 2001. Wood reported hand pain and swelling that awoke him from sleep, and stiffness in the morning.  Dr. Kohen found Wood's thoracic spine, metacarpal and some proximal and distal interphalangeal joints, and left wrist and both ankles to be tender.  Wood had decreased grip strength and decreased motion in his neck.  Dr. Kohen's impression remained unchanged.  R. 144.

Wood was seen for a follow-up exam by Dr. Kohen on May 31, 2002. Wood complained of decreased motion and pain in his neck and upper back,  hand pain, and morning stiffness.  Wood noted that he had had an injection for gout in his left thumb and had not had much pain

---

[11] Lidoderm causes numbness on the skin with which it is in contact and is used as a pain reliever.  Drugs.com, *lidoderm*, http://www.drugs.com/mtm/lidoderm.html (last visited Sept. 19, 2007).

since then.  R. 141; *see also* R. 181.  He noted that he slept poorly, but not from pain.  Upon examination, Dr. Kohen noted tenderness in the cervical and thoracic spine, metacarpal phalangeal joint of the left fifth finger and the interphalangeal joint of the left thumb.  Wood continued to have decreased grip strength and decreased motion in his neck.  Dr. Kohen's impression remained the same.  R. 141.

Wood was next seen by Dr. Kohen on March 14, 2003.  At that time, he had persistent pain in his back with occasional dyspnea, and pain in his knees, feet, and ankles.  He had marked morning stiffness that sometimes lasted all day.  Dr. Kohen noted that Wood's thoracic spine was tender, and he had decreased strength and motion in his spine.  Dr. Kohen's impression continued to be rheumatoid arthritis and cervical spondylosis.  R. 140.

On May 31, 2004, Wood sought treatment for a bat ray sting to his left knee.  This had occurred when he was "gigging for flounder" the previous day.  R. 171.

On July 15, 2003, Wood returned to Dr. Kohen for examination. Wood complained of pain in his neck and back, which radiated down his left arm. He also complained of occasional pain in the thoracic area, and morning stiffness. He was sleeping poorly and had difficulty breathing because of his pain.  He reported that his metatarsal phalangeal joints hurt, but he had less pain in his hands.   Upon examination, Wood's thoracic spine and the area of his left sacroiliac joint were tender. Wood had decreased motion in his neck and spine, but good strength.  Dr. Kohen's impression was rheumatoid arthritis and spinal spondylosis.  R. 139.

A psychiatric evaluation was performed by Sandra Brooks, ARNP, on September 10, 2003, at the East Coast Center for Psychiatry.  Wood reported experiencing panic attacks with

-12-

agoraphobia, depression, shaking, difficulty thinking, thoughts of being attacked, trouble sleeping, anhedonia, crying spells, and impaired memory and concentration since his wife had left him about a month prior. R. 240-41. Brooks noted that Wood's appearance, attitude, and behavior were dysphoric, cooperative, and appropriate, and that his thought process was clear and coherent. He did not have suicidal or homicidal ideation. Brooks observed that Wood was oriented, with average intelligence, and drifting concentration and memory. R. 242. His GAF score was found to be 55[12] at the time of the examination and 65[13] for the previous year. R. 243.

On September 23, 2003, Wood was brought to the emergency room of the Bert Fish Medical Center by ambulance, due to an overdose of Skelaxin.[14] R.217-18.

Wood was then involuntarily admitted to the Halifax Medical Center, where he was seen by Gary Frick, M.D. R. 154, 157. Wood stated that his overdose was impulsive and that he did it out of anger due to his wife leaving him a month and a half prior. He denied having any suicidal or homicidal ideation at that time. Wood acknowledged abusing methamphetamines, which he claimed he had stopped using three months prior to being seen at the medical center. However, his

---

[12] The Global Assessment of Functioning ("GAF") scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, or unable to care for himself). *Harold I. Kaplan, M.D. & Benjamin J. Sadock, M.D., Synopsis of Psychiatry* 299 (8th ed. 1998) (hereinafter *Synopsis of Psychiatry*). A score between 51 and 60 is defined as: "Moderate symptoms (eg, flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (eg, few friends, conflicts with peers or co-workers)." *Id.*

[13] A GAF rating between 61 and 70 reflects: "Some mild symptoms (eg, depressed mood and mild insomnia) OR some difficulty in social, occupational or school functioning (eg, occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Synopsis of Psychiatry* at 299.

[14] Skelaxin is a muscle relaxant that works by blocking nerve impulses in the brain. Drugs.com, *skelaxin*, http://www.drugs.com/mtm/skelaxin.html (last visited Sept. 19, 2007).

urine toxicology screen was positive for amphetamines.  R. 154, 216, 221.  He reported a history

of rheumatoid arthritis and degenerative join disease, resulting in chronic pain.  The medications

he was taking included Prozac,[15] Ativan,[16] Lortab, and Skelaxin.  After a mental status

examination, Dr. Frick noted that Wood was slightly dysphoric, cooperative, and slightly

depressed.  Wood's GAF score was assessed at 60-70.  R. 154-55.

Wood returned to the East Coast Center for Psychiatry on October 2, 2003.  He reported

being anxious, impulsive, hyperactive, dysphoric, agitated, hypomanic, and having rapid-pressured

speech.  He also reported that the Prozac was beginning to "kick in," and, while he still had racing

thoughts, that his depression was a five and his anxiety was a three on a ten-point scale.  The

diagnosis was major depressive disorder.  R. 239.

On October 23, 2003, Wood returned to the East Coast Center for Psychiatry.  Wood

reported being anxious and having racing thoughts and insomnia.  His attitude was improving, and

he noted that he was getting out of the house and visiting neighbors. He indicated that he would

like to go fishing.  At the time of the therapy, he was neatly dressed and groomed.  The diagnosis

was again major depressive disorder.  R. 238.

---

[15] Prozac is an antidepressant that affects chemicals in the brain that become unbalanced and cause depression, panic, anxiety, or obsessive-compulsive symptoms.  Drugs.com, *Prozac*, http://www.drugs.com/mtm/prozac.html (last visited Sept. 19, 2007).

[16] Ativan affects chemicals in the brain that may become unbalanced and cause anxiety and insomnia.  Drugs.com, *ativan*, http://www.drugs.com/mtm/ativan.html (last visited Sept. 19, 2007).

Wood next reported to the East Coast Center for Psychiatry for examination on October 28, 2003.  He reported that his Prozac had kicked in and that he was doing better.  Once again, the diagnosis was major depressive disorder.  R. 237

Wood was seen for a follow-up examination with Dr. Kohen on December 9, 2003.  At that time, he had pain in his right shoulder, left thumb, and low back, and morning stiffness lasting two hours.  Dr. Kohen noted that Wood's right acromioclavicular joint and right shoulder were tender with reduced range of motion, but his spine and lower extremities were not tender.  Wood walked with a limp, but his strength was good.  Dr. Kohen's impression was rheumatoid arthritis and spinal spondylosis.  R. 138.

Wood returned to Dr. Kohen for examination on April 9, 2004.  Wood complained that his back, shoulders and left knee hurt.  He reported experiencing morning stiffness in his knees and ankles lasting two hours, sleeping poorly, and engaging in little activity due to his pain.   Upon examination, Dr. Kohen noted that Wood's spine, left knee and shoulder were tender, his knee had a bony enlargement, and he had decreased motion in his spine.  Dr. Kohen's impression was unchanged.  R. 303.

On April 20, 2004, Wood was seen by Kiran Patel, M.D., for a physical examination at the request of the SSA.  Wood stated that he lived with chronic pain.  He reported that he could walk or do other activities for ten minutes before his back became aggravated and his pain became severe. Due to rheumatoid arthritis, he experienced pain in his ankles, knees, neck, shoulder and hip. R. 244.  Upon examination, Dr. Patel noted that Wood's back and spine had a markedly decreased range of motion, while his upper and lower extremities revealed a mildly decreased

range of motion.  His grip strength was good, and he could button and unbutton his shirt.  R. 245.

In reviewing a cervical spine x-ray, Dr. Patel observed that Wood had arthritic changes throughout

the cervical spine, but the intervertebral disc spaces were intact.  An x-ray of Wood's right

shoulder showed decreased joint spacing, but no degenerative changes or acute process or

fractures.  An x-ray of the lumbosacral spine revealed that Wood's intervertebral disc spaces were

intact and that Wood only had mild arthritic changes.  An x-ray of the hips showed arthritic and

mild degenerative changes throughout both hips.  R. 246.

On April 24, 2004, Wood was seen by J. Jeff Oatley, Ph.D., for a psychology evaluation at

the request of the SSA.  Wood indicated that he had chronic pain from herniated discs, and was

depressed and anxious.  R 249.  He indicated that he had been off medications since the first of the

year, when he lost his insurance.  He had gained thirty pounds recently.  R. 250.  Wood was able to

care for his personal hygiene, but his mother did the household chores and cooking because Wood

had difficulty completing tasks due to pain.  He had no friends and spent his days watching

television.  R. 251.  Upon examination, Dr. Oatley observed that Wood did not have concentration

deficits or any orientation or memory problems.  R. 250.  Wood was able to walk with his left knee

straight, but Dr. Oatley noted a tremor in Wood's hands.  His attention span was good.  Dr.

Oatley's assessment was that Wood had amphetamine dependence.[17] R. 250-51.

---

[17]  The ALJ credited Wood's testimony that he had not used drugs in two years.  R. 14.

In May 2004, Wood sought treatment for a headache that had lasted for two days.  R. 195.

On August 6, 2004, Wood returned to Dr. Kohen for examination. Wood reported left sacroiliac to left ankle pain, which kept him awake at night, and morning stiffness in his feet. After examination, Dr. Kohen noted that Wood walked with a limp, had tenderness in his left knee, left ankle, and in his spine.  Dr. Kohen further noted decreased motion in his spine, but good strength. Dr. Kohen's diagnosis was rheumatoid arthritis and spinal spondylosis.  R. 302.

Wood was seen by Dr. Kohen for examination on November 10, 2004.  Wood complained of pain in the left hip radiating to the left ankle for the past month, morning stiffness for two to three hours, and trouble sleeping.  Examination revealed tenderness throughout the area of his spine with decreased motion in the spine and left hip, and decreased strength.  Dr. Kohen noted that Wood walked with a limp. Dr. Kohen's impression was acute left sciatica, rheumatoid arthritis, and spinal spondylosis.  R. 309.

Wood was next seen by Dr. Kohen on March 9, 2005.  He reported pain in his left ankle, left hip, and hands, with swelling and pain in his feet.  He continued to have morning stiffness lasting one to two hours, trouble sleeping, and an inability to engage in activity.  Upon examination, his left shoulder, left wrist, right proximal interphalangeal joints, metatarsal phalangeal joints, left ankle, and spine were all tender.  He had decreased movement in his spine and wrists, along with decreased strength.  Dr. Kohen's diagnosis was rheumatoid arthritis and spinal spondylosis.  R. 308.

On August 4, 2005, Wood was seen by Dr. Kohen for a follow-up examination.  Wood had left leg sciatica from the left sacroiliac joint to the left ankle, moderate morning stiffness, trouble

-17-

sleeping, swelling in his feet, and pain with increased activity.  He could not afford his pain medication.  During  his examination, Dr. Kohen noted that Wood limped on his left leg.  Wood's left wrist was tender with decreased motion in both wrists, but his spine and lower extremities were not tender.  Dr. Kohen's diagnosis remained unchanged.  R. 307.

On October 14, 2005, Dr. Kohen completed a medical assessment of Wood's ability to do work-related activities as of December 31, 2000.  R. 304.  In his assessment, Dr. Kohen limited Wood to sitting for fifteen to twenty minutes, standing for ten minutes, and walking for ten to fifteen minutes at a time, for a total of one hour for each activity, in an eight-hour day.  R. 304-05.  Wood could lift five pounds and carry eight to ten pounds occasionally.  R. 304.  Wood would have trouble handling objects, and much trouble bending, pushing and/or pulling due to hand swelling.   He would have problems working in cold environments due to stiffness and in hot environments due to fatigue.  R. 305.

      D.    *Reviewing Professionals*.

          1.    <u>Physical Functional Capacity Assessments</u>.

J. Vergo Attlesey, M.D., prepared a physical RFC assessment after reviewing Wood's records in May 2004.  R. 252-60.  Dr. Attlesey opined that Wood could lift twenty pounds occasionally and ten pounds frequently. He could sit, stand, or walk about six hours during an eight-hour workday.  R. 253.  He could only occasionally balance, stoop, kneel, crouch and climb, and he could frequently crawl.  R. 254.  He should avoid concentrated exposure to hazards.  R. 256.

In September, 2004, Gloria B. Hankins, M.D., completed a physical RFC assessment after reviewing Wood's medical records.  R. 293-300.  She opined that Wood could lift twenty pounds occasionally and ten pounds frequently. He could sit, stand, or walk about six hours during an eight-hour workday.  R. 294.  He could only occasionally balance, stoop, crouch and climb ramps, stairs, ladders, ropes, and scaffolds.  R. 295.

2.    Mental Functional Capacity Assessments.

Sharon Ames-Dennard, Ph.D., completed a Psychiatric Review Technique form after reviewing Wood's records.[18]  R. 261-74.  Dr. Ames-Dennard opined that Wood did not have any severe mental impairments.  R. 261.  She concluded that Wood would have only mild limitations in activities of daily living.  R. 271.

In August 2004, Theadore J. Weber, Psy.D., completed a Psychiatric Review Technique form and mental RFC form after reviewing Wood's records.  R. 275-92.  Dr. Weber opined that Wood would have mild limitations in activities of daily living and maintaining social functioning, and moderate limitations in maintaining concentration, persistence, or pace, with one or two episodes of decompensation.  R. 289.  He further concluded that Wood would be moderately limited in the following abilities: understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; completing a normal workday and week without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; accepting

---

[18] The date of the Psychiatric Review Technique form was illegible.  R. 261.

instructions and responding appropriately to criticism from supervisors; and setting realistic goals or making plans independently of others.  R. 275-76.

## IV.      STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI or SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).  In a case under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits.  42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits.  In sum, an ALJ must apply the following criteria, in sequence:

(1) Is the claimant presently unemployed?

(2) Is the claimant's impairment severe?

(3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?

(4) Is the claimant unable to perform his or her former occupation?

> (5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative answer leads to a finding of "not disabled."  *See, e.g.*, *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1987).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits."  *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).  However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform."  *Id*. at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210.  "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment. *Id*.

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988). Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## V.     ANALYSIS.

Wood asserts that the ALJ erred in not giving substantial weight to the testimony of his treating physician. Wood also asserts that the ALJ's findings regarding his daily activities were not based on substantial evidence, and that the Commissioner failed to sustain her burden of

establishing that there was other work in the national economy that Wood could perform.  These are the only issues I will address.[19]

A.      *Opinions of Treating Physicians.*

Wood contends that the ALJ erred by failing to give controlling weight to Dr. Kohen's RFC assessment.  Dr. Kohen treated Wood from 1996 through 2005.  The opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary."  *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 C.F.R. § 404.1527(d)(2)).  Good cause has been found "where the doctor[s'] opinion[s] [were] not bolstered by the evidence, . . . where the evidence supported a contrary finding[,] . . . [or] where the doctors' opinions were conclusory or inconsistent with their own medical records."  *Id.* (internal citations omitted).  The ALJ must articulate the reasons for giving lesser weight to the opinion of a treating physician.  *Id.*  However, the ultimate determination of whether a claimant qualifies for disability under the Act is made by the SSA.  20 C.F.R. § 404.1527(e)(1).

The ALJ stated the following reasons for failing to give significant weight to Dr. Kohen's RFC assessment:

> [T]he opinion of this . . . doctor appears on a fill-in-the-blank form, with only marginal notes attached to it.  Such reports unaccompanied by a thorough written report have been determined by the courts to be weak evidence and their reliability is suspect.  *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993).  Furthermore, the opinion of this doctor, who assessed the claimant with the residual functional capacity of less than sedentary work is not afforded any significant weight as this opinion conflicts with the substantial evidence of record, documenting less severe limitations.  (Social Security Ruling 96-6p).  The doctor did not adequately consider the entire record, including the statements of collateral sources and the

---

[19] The parties were advised that issues not specifically raised would be waived.  Doc. No. 11 at 2.

objective findings of other treating physicians.  The objective evidence in the record does not support the level of severity that this doctor assigns.

R. 17.

The ALJ's stated reasons for giving lesser weight to Dr. Kohen's restrictions are supported by the record.  Although there are many reports of Dr. Kohen's examination of Wood, Dr. Kohen did not indicate in any of those reports the severe functional limitations reflected on his RFC assessment.  Dr. Kohen's reports reflect that Wood had tenderness in the neck and spine, sometimes with decreased range of motion.  From time to time, his grip strength was noted to be decreased, and starting in late 2003, Dr. Kohen noted that Wood walked with a limp.  These findings alone are not sufficient, without explanation, to support Dr. Kohen's assessment that Wood could not perform even sedentary work.

Wood also argues that the ALJ committed reversible error in according significant weight to the opinions of the non-examining medical consultants. In *Green v. Social Security Administration*, 223 Fed. Appx. 915, 923 (11th Cir. 2007), the Eleventh Circuit rejected an argument that "once the ALJ decided to discredit [a treating physician's] evaluation, the record lacked substantial evidence to support a finding that the [claimant] could perform light work." Instead, the court found that the ALJ was entitled to rely upon the medical records from other doctors in reaching the RFC determination.  Moreover, an ALJ is permitted also to rely on the opinions of reviewing physicians if their opinions are supported by the record.  *See* 20 C.F.R. §§ 404.1527(f)(2)(l), 416.927(f)(2)(l).

The ALJ applied the correct legal standard in assessing the weight to accord to Dr. Kohen's opinion.  She articulated adequate reasons, supported by substantial evidence, for giving lesser

weight to Dr. Kohen's opinion, which is sufficient to establish good cause for her determination. Accordingly, the assignment of error is unavailing.

      B.    *The ALJ's Evaluation of Wood's Daily Activities.*

In making her RFC determination, the ALJ found that Wood's performance of daily activities was consistent with the performance of many basic work activities. Wood argues that the ALJ's findings concerning his daily activities, and the daily activities' relation to basic work activities, were not supported by substantial evidence.

The ALJ found that Wood was "able to take care of his personal hygiene, prepare meals, read as a pas[t]time, watch television, operate a motor vehicle and run simple errands, and go[ ] fishing. The claimant drove himself to the hearing. He has his ten year old son for visitation every weekend, and testified he engages in activities with the child all weekend." R. 15. There is substantial evidence in the record to support each of these findings.

Wood contends that the ALJ ignored other facets of his daily activities, including that he lives with his mother, who takes care of the household chores, and that he seldom goes out. However, the ALJ's opinion noted that Wood lived with his mother, R. 15. Wood also emphasizes that he missed his grandparent's birthday party because he did not feel like going as evidence of his inability to function outside the home, but the ALJ correctly observed evidence in record that Wood was able to leave his home to go to church, to go fishing, and to run simple errands.

"[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision . . . is not a broad rejection" of the evidence. *Dyer*,

395 F.3d at 1211.  In this case, the ALJ's decision reflects a careful review of the record, and

substantial evidence supports the determination regarding Wood's activities of daily living.

Accordingly, this assignment of error is also unavailing.

     C.    *The Availability of Other Work in the National Economy.*

    Wood next argues that the Commissioner failed to sustain his burden of establishing that

there is other work available in the national economy that Wood could perform.  Specifically,

Wood argues that the VE's testimony concerning work that he could perform based on his

restrictions was in conflict with the requirements of the jobs provided by the VE as listed in the

Dictionary of Occupation Titles (DOT).  Wood contends that the jobs the VE identified are not

unskilled work because they require a reasoning level in excess of the RFC determined by the ALJ.

The Commissioner contends, however, that the specific vocational preparation (SVP) portion of

the job description, rather than the reasoning level, is what should be used to determine whether a

job is unskilled.

    The SSA defines unskilled work as "work which needs little or no judgment to do simple

duties that can be learned on the job in a short period of time.  . . . [A] person can usually learn to

do the job in 30 days, and little specific vocational preparation and judgment are needed."

20 C.F.R. §§ 404.1568(a), 416.968(a).  The SSA relies upon Department of Labor publications to

determine the skill level of jobs.  *Id.*

    In social security ruling 00-4p, the SSA indicated that it looks to the specific vocational

preparation needed to perform a job to determine the skill level required.

        A skill is knowledge of a work activity that requires the exercise of
        significant judgment that goes beyond the carrying out of simple job

-26-

> duties and is acquired through performance of an occupation that is above the unskilled level . . . . Skills are acquired in [past relevant work] and may also be learned in recent education that provides for direct entry into skilled work. The DOT lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in [the regulations], unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT.

Soc. Sec. Rul. 00-4p, 2000 WL 1898704, at *3. In the present case, each of the jobs identified by the VE had an SVP 2, which falls within the SSA's definition of unskilled work.

However, the ALJ did not ask the VE merely for unskilled work; he asked the VE to assume that the hypothetical claimant could perform only *simple*, unskilled work. If the definition of skill level alone were all that were relevant, the added factor that the work had to be simple would have been redundant. In this context, Wood's argument is compelling.

The ALJ found that Wood must perform simple tasks due to his moderate limitations in the ability to concentrate. R. 15. The ALJ did not include the finding that Wood had a limited ability to concentrate in his hypothetical question to the VE. Without this express limitation in the hypothetical question, or some other indication that the VE understood that the ALJ's reference to simple work meant something more than unskilled work, the record is not sufficient for this Court to determine if the ALJ's decision at step five of the sequential evaluation process is supported by substantial evidence. *Cf. Walton v. Chater*, No. 94 C 1484, 1995 WL 579535, at * 8 n.5 (N.D. Ill. Sept. 25, 1995)(in response to a hypothetical question, the VE stated that he did not have a definition for simple work, and asked that the ALJ phrase the question in terms of skill; the court

found that the response regarding unskilled work did not account for the nonexertional impairment requiring simple work).

Because the record is not fully developed at step five of the evaluation process, remand for an award of benefits is not appropriate.  *See Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997). Accordingly, the case will be remanded for further proceedings.

## VI.    CONCLUSION.

For the reasons set forth herein, it is **ORDERED** that the decision of the Commissioner is **REVERSED** pursuant to sentence four of 42 U.S.C. § 405(g) and **REMANDED** for further proceedings.  The Clerk of Court is directed to issue a judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on September 24, 2007.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

-28-